# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

LESLIE TYLER-PERKINS,

      Plaintiff,

v.                                    Civil Action No. 3:18cv872

VIRGINIA COMMUNITY COLLEGE SYSTEM, *et al.*,

      Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on Defendants Virginia Community College System ("VCCS") and the Commonwealth of Virginia's (collectively, with VCCS, "Defendants") Motion to Dismiss for Failure to State a Claim (the "Motion to Dismiss"). (ECF No. 18.) Plaintiff Leslie Tyler-Perkins responded to the Motion to Dismiss, (ECF No. 20), and Defendants replied, (ECF No. 21).

These matters are ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction over Tyler-Perkins's claims pursuant to 28 U.S.C. § 1331.[1] For the reasons stated below, the Court will grant Defendants' Motion to Dismiss.

---

[1] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Tyler-Perkins brings one count of race and sex discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

# I. Factual and Procedural Background

## A.      Factual Background[2]

This Title VII action arises out of the Defendants' allegedly "unlawful and discriminatory application of its layoff and job classification policy and procedures against [Tyler-Perkins] on the basis of race and/or gender." (Am. Compl. ¶ 1, ECF No. 17.)

### 1.      Tyler-Perkins Employment Allegations Prior to October 29, 2017

Prior to her resignation, Tyler-Perkins, a fifty-three-year-old African-American woman, worked as an automotive instructor at J. Sargeant Reynolds Community College ("JSRCC"). (*Id.* ¶ 12.) Throughout her tenure at JSRCC, Tyler-Perkins contends that she was an "excellent employee and satisfactorily performed her job duties." (*Id.* ¶ 14.)

In 2006, JSRCC hired Tyler-Perkins as an "Adjunct Instructor" in the Automotive Technology Department. (*Id.* ¶ 13.) Two years later, in 2008, JSRCC hired her as a "full-time Nine-Month Teaching Faculty." (*Id.* ¶ 15.) "Shortly thereafter," the Interim Dean of JSRCC evaluated Tyler-Perkins and "noted [that] she had extensive GM automotive training." (*Id.* ¶ 16.) Following that evaluation, the Assistant Dean of the Goochland Campus asked Tyler-Perkins to "undertake Ford automotive training [so she could] teach classes to work on Ford automobiles and be the backup instructor for the Ford program." (*Id.*)

"At about the same time," the Coordinator of the GM ASEP program resigned, and JSRCC hired a Caucasian male to fill this position. (*Id.* ¶ 17.) Without saying that she applied

---

[2] For the purpose of this Rule 12(b)(6) Motion to Dismiss, the Court will accept the well-pleaded factual allegations in the Amended Complaint as true, and draw all reasonable inferences in favor of Tyler-Perkins. *Kensington Volunteer Fire Dep't v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) ("[A] court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011))).

or showed interest in the position, Tyler-Perkins contends that the man JSRCC hired "was hired to a full-time position at JSRCC at the same time as [Tyler-Perkins] and [she] had more GM training and experience than" he did. (*Id.*) Again, without claiming that she applied or showed interest in other positions, Tyler-Perkins avers that "[e]ach time a twelve-month faculty position became available, JSRCC bypassed [her] in favor of Caucasian male faculty, despite [Tyler-Perkins] meeting necessary qualifications for each position." (*Id.* ¶ 18.)

> Without providing a date, Tyler-Perkins contends that when she
>
> received a full-sized tool box to work with and to be used to teach her automotive classes, like all other Automotive Technology faculty who were all male and who already had full-sized tool boxes, the program head then gave the male employees copies of [Tyler-Perkins's] keys and the male colleagues used [Tyler-Perkins's] tool box as community property.

(*Id.* ¶ 19.) She avers that "[n]one of the Caucasian faculty had to give up copies of their toolbox keys." (*Id.*)

In 2013, the Coordinator of the Ford ASSET Program, a Caucasian male, became ill and could not work. (*Id.* ¶ 20.) Tyler-Perkins applied for this position, obtained it, and requested the same twelve-month contract held by the former coordinator. (*Id.*) JSRCC, however, only awarded her a nine-month contract. (*Id.* ¶ 20.) Although the Dean of the Business School told Tyler-Perkins that "he would request a twelve-month contract, . . . it was not obtained." (*Id.* ¶ 21.)

After receiving this position, JSRCC "forced [Tyler-Perkins] to undergo a rapid training and preparation schedule to teach classes according to Ford and JSRCC standards," which required "extensive traveling" out of Virginia "once or twice a month." (*Id.* ¶ 22.) Tyler-Perkins also requested her pay "be rectified as a lower rank Caucasian male instructor currently made 5 to 7% more than" she, but, she alleges, she "did not obtain any increase in pay." (*Id.* ¶¶ 23–24.)

Tyler-Perkins contends that she "regularly earned less than lower ranked Caucasian male instructors." (*Id.* ¶ 26.)

When she began her new position, JSRCC "required" Tyler-Perkins and the prior Coordinator of the Ford Asset Program "to switch work and teaching toolboxes." (*Id.* ¶ 25.) Tyler-Perkins maintains that "JSRCC again requested [that she] . . . provide a copy of the keys to the program head." (*Id.*) She avers that JSRCC "only made this a requirement of the African-American manufacture program teachers . . . [n]one of the Caucasian faculty had to give up copies of their toolbox keys." (*Id.*)

In 2016, JSRCC hired a Caucasian male as the "program head of Automotive Technology." (*Id.* ¶ 27.) In 2017, the Dean of the Business School met with Tyler-Perkins for a yearly performance evaluation and gave Tyler-Perkins "until November to get her [Automotive Service Excellence] L1 Certification to support her job position requirements." (*Id.* ¶ 28.) On October 16, 2017, the Dean then "wrongfully issued a counseling memorandum to [Tyler-Perkins] for not having her . . . L1 Certification and threatened to fire" her. (*Id.* ¶ 29.)

## 2. Tyler-Perkins's Employment Allegations After October 29, 2017

"During this time in the Fall 2017 semester, JSRCC implemented reductions in force due to declining enrollment." (*Id.* ¶ 31.) "As a result, on October 31, 2017, the Dean issued a letter to [Tyler-Perkins] notifying her of her layoff." (*Id.* ¶ 32.) Tyler-Perkins avers that she "was the most senior faculty member in the layoff of Automotive Technology faculty." (*Id.* ¶ 34.) While recognizing that she "was the only African-American female faculty member of the Automotive Technology department of JSRCC," Tyler-Perkins maintains that she "was the only person of color and the only female in the Automotive Technology department who JSRCC laid off." (*Id.* ¶¶ 35, 48.)

Tyler-Perkins asserts that VCCS Policy 3.11.1.1.b (the "Policy") "establishes guidelines for releasing teaching faculty in order of least seniority, providing, in part, 'teaching faculty within a given discipline, teaching field or program shall be released in order of least seniority.'" (*Id.* ¶ 36 (quoting the Policy).) Tyler-Perkins claims that JSRCC, "in violation of" the Policy, "retained [the new head of Automotive Technology], who JSRCC hired well after" her. (*Id.* ¶ 33.) She maintains that her "instructor position and the program head position are both in the same teaching field, Automotive Technology, and [she] had more seniority" than the more-recently hired program head. (*Id.* ¶ 37.)

On November 6, 2017, after JSRCC had issued her a letter notifying her of her layoff, Tyler-Perkins asserts that the Dean of the Business School "again wrongfully issued a counseling memorandum to [her] for not having her . . . L1 Certification." (*Id.* ¶ 38.)

On December 1, 2017, about two months after her layoff, Tyler-Perkins challenged her layoff through the VCCS grievance procedure, where she lost in the immediate appeals process. (*Id.* ¶ 39.) She then appealed to an Ad Hoc Hearing Committee. (*Id.*) On April 18, 2018, about four months after her first appeal, the Ad Hoc Hearing Committee found in favor of Tyler-Perkins, concluding that VCCS "did not follow [the] [P]olicy . . . as both challenged positions are teaching faculty, and both positions are in the same teaching field, Automotive Technology." (*Id.* ¶ 40.) However, "the President of JSRCC overturned this decision," and Tyler-Perkins appealed to the VCCS Appeals Panel, which "upheld the President's decision." (*Id.* ¶ 41.)

Tyler-Perkins next appealed to the State Board for Community Colleges. (*Id.*) On July 14, 2018, while the appeals process proceeded, Tyler-Perkins took a teaching position at the Greene County Technical Center, in Greene County, Virginia, which paid her a lower salary than JSRCC and required a longer commute from her home. (*Id.* ¶ 42.) Later, the State Board for

Community Colleges "agreed with [Tyler-Perkins's] position and ordered reinstatement . . . without any loss of rank, seniority, status, or continuity of service." (*Id.* ¶ 43.) "On or about July 31, 2018," about eight months after JSRCC laid off Tyler-Perkins, JSRCC reinstated her. (*Id.* ¶ 44.)

After her reinstatement with JSRCC, JSRCC "informed [Tyler-Perkins], by counsel, she was again going to be slated for JSRCC's next and upcoming round of layoffs and it would be in her best interest to resign." (*Id.* ¶ 45.) Defendants attach to their Motion to Dismiss the email to which Tyler-Perkins refers in her Amended Complaint.[3] (Mem. Supp. Mot. Dismiss Ex. 14 "the Email," ECF No. 19-14.) The email shows that, prior to Tyler-Perkins's reinstatement, Counsel for JSRCC sent the email to all staff and faculty informing them of the upcoming budget cuts and the need to implement budget saving measures. (*Id.* 2–3.) In that email, Counsel for JSRCC said that "VCCS feels strongly that Ms. Tyler-Perkins should have the information . . . so that she may make an informed decision on the college's recent offer of reinstatement." (*Id.* 1.) Counsel for JSRCC clarifies that the information contained in the email "does not negatively affect the offer of reinstatement in any way." (*Id.*)

On August 15, 2018, about two weeks after her reinstatement, Tyler-Perkins "involuntarily resigned from JSRCC" because of JSRCC's "prior discriminatory practices, fear

---

[3] In most cases, the Court may only consider "the complaint in its entirety, as well as documents attached or incorporated into the complaint[,]" at the motion to dismiss stage without "convert[ing] the motion [to dismiss] into one for summary judgement." *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 448 (4th Cir. 2011). However, the Fourth Circuit has "held that when a defendant attaches a document to its motion to dismiss, a 'court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'" *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)) (alteration in original). The Court can consider the email because Tyler-Perkins refers to it in the Amended Complaint and does not dispute its validity.

of returning to a hostile work environment, just having obtained her new job position, and feeling she had no other option." (*Id.* ¶ 46.)

About ten days after her "involuntary resign[ation]," Tyler-Perkins "filed a Title VII Charge of Discrimination based on race and sex with the Equal Opportunity Commission ('EEOC'), and, pursuant to a work sharing agreement, with the Virginia Division of Human Rights." (*Id.* ¶ 6.) On September 18, 2018, the "EEOC issued a Notice of Right to Sue to [Tyler-Perkins], which [she], by counsel, received on September 20, 2018." (*Id.* ¶ 7.)

## B. **Procedural Background**

On December 18, 2018, Tyler-Perkins timely filed a single-count Complaint alleging race and sex discrimination against Defendants. (ECF No. 1.) Defendants then filed an untimely Motion to Dismiss for Failure to State a Claim, (ECF No. 5), Tyler-Perkins responded, (ECF No. 7), and Defendants replied (ECF No. 9). This Court then issued an Order requiring the Defendants to "stat[e] the legal basis for the Court to consider [the] untimely Motion to Dismiss." (Apr. 12, 2019 Order 2, ECF No. 10.) Defendants filed a Response to the Court's Order. (Resp. April 12, 2019 Order, ECF No. 11.)

In their Response, Defendants stated that after consulting with Counsel for Tyler-Perkins, "the parties agreed . . . that responding to the Court with the proposed consent order," which allowed Tyler-Perkins to amend her Complaint, "would be mutually beneficial to them and would best serve judicial economy." (*Id.* 7.) Therefore, this Court ordered "Tyler-Perkins to file an amended complaint." (Apr. 24, 2019 Order 3, ECF No. 12.)

After the deadline to file her Amended Complaint had passed, Tyler-Perkins filed a Motion for Extension of Time to amend her Complaint, (ECF No. 13), Defendants responded,

(ECF No. 15), and Tyler-Perkins did not reply. The Court allowed Tyler-Perkins to untimely file her Amended Complaint. (June 3, 2019 Order 4–5, ECF No. 16.)

Tyler-Perkins then filed a one-count Amended Complaint bringing the same Title VII claim against Defendants based on race and sex discrimination. The Defendants then filed the instant Motion to Dismiss. Tyler-Perkins filed a response, and the Defendants replied.

## II. Federal Rule of Civil Procedure 12(b)(6) Standard

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.") Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense."

8

*Francis*, 588 F.3d at 193. The Court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 676–79; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus., Inc.*, 637 F.3d at 440)). This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

### III. Analysis

Tyler-Perkins brings a single claim of race and gender discrimination arising under Title VII of the Civil Rights Act of 1964 against Defendants. Because Tyler-Perkins seeks to support her claim with conduct that occurred more than 300 days before she filed her grievance, the Court must find that the majority of Tyler-Perkins's allegations are time-barred. The only allegations that remain pertain to her October 2017 layoff from JSRCC. Based on the allegations the Court is allowed to consider, Tyler-Perkins has not pleaded sufficient facts to support her claim of unlawful employment discrimination because she has not shown that JSRCC subjected her to an adverse employment action through her October 2017 layoff or that it constructively discharged her in August 2018. For these reasons, the Court will grant the Motion to Dismiss and dismiss the Amended Complaint.

**A.** **Because Tyler-Perkins Does Not Sufficiently Bring a Hostile Work Environment Claim, the Continuing Violation Doctrine Cannot Apply and the Majority of Her Allegations are Time-Barred**

In Virginia, a Title VII plaintiff may support his or her claim with conduct that occurred 300 days prior to the date on which he or she filed her complaint with the EEOC. Discriminatory acts occurring before that time are time-barred. Tyler-Perkins contends that the Court may consider conduct that occurred before that date by utilizing the continuing violation doctrine. However, because she does not sufficiently allege a hostile work environment claim, the continuing violation doctrine does not apply. Therefore, the Court can consider only Tyler-Perkins's allegations that occurred after October 29, 2017.

**1.** **Tyler-Perkins Does Not Sufficiently Allege a Hostile Work Environment Claim**

In her Amended Compliant, Tyler-Perkins twice states that she feared returning to a "hostile work environment." (Am. Compl. ¶¶ 46, 54.) Tyler-Perkins does not label her claim as one for hostile work environment, and the facts as alleged in the Amended Complaint fail to support her conclusory allegation. Rather, Tyler-Perkins's claim may properly be characterized as a so-called "discrete acts" discrimination claim.

Discrete acts independently give rise to liability. "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

In contrast, a "hostile work environment claim," which Tyler-Perkins references here, requires "a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). "Hostile work environment claims

10

are different in kind from discrete acts. Their very nature involves repeated conduct." *Id.* at 115. "The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.*

Hostile work environment claims arise "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 116 (internal quotation marks and citations omitted). For example, in *Nnadozie v. Genesis Healthcare Corporation*, the United States Court of Appeals for the Fourth Circuit held that the plaintiff, a registered nurse from Nigeria, worked in a hostile work environment for purposes of § 1981 when the plaintiff's supervisor "told [the plaintiff] that she believed 'Africans [were] going to kill' her or make her 'sick' by 'putting voodoo on [her].'" 730 Fed. App'x 151, 155 (4th Cir. 2018) (argued but unpublished). The supervisor "kept a 'voodoo catcher' in her office for protection and would perform a 'ritual in front of her door' before going inside." *Id.* The supervisor also screamed at the plaintiff and would tell another employee that "she didn't like the Africans and wanted them all out of the building." *Id.*

In contrast, in *Perkins v. International Paper Company*, the Fourth Circuit concluded that an employer did not subject the plaintiff, an African American male, to a hostile work environment when the plaintiff testified that he was, among other things: "passed over for several promotion requests;" "that white employees were promoted more often than African American employees;" and, that he was questioned about working overtime when white employees were not. 936 F.3d 196, 209 (4th Cir. 2019). The *Perkins* plaintiff also alleged that "most of the employees at the bottom of his department's list of ranking technicians were

African Americans and females;" and that the company "denied his request for retroactive application of the new amount of education benefits when it approved the new amount for current participants, including white employees." *Id.* The Fourth Circuit concluded that the company did not subject the plaintiff to a hostile work environment based on these incidents that spanned six years because they "cannot reasonably be described as either frequent, physically threatening or humiliating" and the plaintiff did "not allege the incidents interfered with his ability to perform his job."[4] *Id.*

Although Tyler-Perkins mentions "hostile work environment" twice in her Amended Complaint, the facts as she alleges them cannot support a hostile work environment claim. For instance, Tyler-Perkins contends that JSRCC forced her to share a copy of her toolbox key and required her to "undergo a rapid training and preparation schedule." (Am. Compl. ¶¶ 19, 22.) These allegations—even alongside others—do not plausibly raise an inference that Tyler-Perkins's work environment was "permeated with discriminatory intimidation, ridicule, and insult." *Morgan*, 536 U.S. at 116.

Tyler-Perkins also alleges that JSRCC continually failed to promote her to various positions. She states that JSRCC's termination of her employment constituted discrimination. As the Supreme Court of the United States recognized, this type of conduct constitutes discrete acts that "are easy to identify" and each action may independently give rise to liability. *Id.* at 114. The Fourth Circuit has also concluded that these types of actions fail to support a hostile work environment claim. *See Perkins*, 936 F.3d at 209.

---

[4] In *Perkins*, the Fourth Circuit considered allegations outside of the applicable statute of limitations period because, as explained below, "the continuing violation doctrine applies to a hostile work environment claim." *Perkins*, 936 F.3d at 209 n.5 (citations omitted).

Tyler-Perkins's allegations of termination and failure to promote, coupled with her remaining allegations, fail to plausibly allege a hostile work environment even when read favorably. For this reason, although Tyler-Perkins uses the talismanic language "hostile work environment," she fails to support this language with sufficient facts to state a hostile work environment claim. Rather, her use of the phrase amounts to a mere legal conclusion, not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 679; *Twombly*, 550 U.S. at 555. The Court must deem her claim as one of so-called "discrete acts."

### 2. Because the Continuing Violation Doctrine Does Not Apply, the Court Cannot Consider the Majority of Tyler-Perkins's Allegations

The continuing violation doctrine—which allows the Court to consider discriminatory conduct outside of the applicable statute of limitations—does not apply to Tyler-Perkins's race and gender discrimination claim that relies on discrete acts.

For the Court to consider alleged acts of discrimination, those acts must have occurred within the applicable limitations period. *Gilliam v. S.C. Dep't. of Juvenile Justice*, 474 F.3d 134, 139 (4th Cir. 2007). When the plaintiff has also filed her charge with her state's employment discrimination agency—such as the Virginia Division on Human Rights—the limitations period for filing a Title VII claim with the Equal Employment Opportunity Commission ("EEOC") is 300 days from the allegedly discriminatory action. 42 U.S.C. § 2000e-5(e)(1); *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 439 (4th Cir. 1998), *overruled on other grounds by Morgan*, 536 U.S. 101. "Any discrete acts of discrimination that occurred prior to the applicable period are procedurally barred and cannot be used as a basis for recovery." *Gilliam*, 474 F.3d at 139. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113.

The continuing violation doctrine allows a court to consider conduct outside the 300-day time limit if the conduct constitutes "'a series of separate but related acts' such that they are 'manifested in a continuing violation.'" *Stringfield v. Christopher Newport Univ.*, 64 F. Supp. 2d 593, 596 (E.D. Va. 1999) (quoting *Jenkins v. Home Ins. Co.*, 635 F.2d 310, 312 (4th Cir. 1980)). There must be a "present violation" within the 300-day statutory period. *Woodard v. Lehman*, 717 F.2d 909, 914–15 (4th Cir. 1983). However, this doctrine applies only to hostile work environment claims. *Morgan*, 536 U.S. at 115; *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) ("The continuing violation theory allows for consideration of incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination, i.e., when the incidents make up part of a hostile work environment claim.") (citations omitted).

On August 26, 2018, Tyler-Perkins filed an EEOC claim based on race and sex discrimination with the Virginia Division of Human Rights. (Am. Compl. ¶ 6.) Therefore, she may support her discrimination claim with conduct that occurred after October 29, 2017—300 days prior to the date on which she filed her EEOC claim. *See Tinsley*, 155 F.3d at 439 (finding that the "Virginia [Division] on Human Rights is a qualifying deferral agency because it has the authority to seek relief from unlawful employment practices, and therefore discrimination claims filed in Virginia are subject to a 300-day period of limitations.")

In both her original Complaint and her Amended Complaint, Tyler-Perkins brings only a single count of race and sex discrimination in violation of 42 U.S.C. § 2000e-2(a)(1). Because, as stated above, Tyler-Perkins does not sufficiently allege a hostile work environment, the continuing violation doctrine does not apply. Therefore, the Court is constrained only to

consider allegations of conduct that occurred after October 29, 2017,[5] pertaining to Tyler-Perkins's layoff.

### B.    <u>Tyler-Perkins's Layoff Cannot Establish a Claim of Disparate Treatment</u>

Nor do Tyler-Perkins's allegations about her layoff support a disparate treatment claim, even at this early stage. Because JSRCC reinstated Tyler-Perkins "without any loss of rank, seniority, status, or continuity of service," (Am. Compl. ¶ 43), and the allegations in Tyler-Perkins's Amended Complaint cannot support a constructive discharge claim, Tyler-Perkins fails to plead facts sufficient to establish an adverse employment action. The Court must grant the Motion to Dismiss.

### 1.    <u>Legal Standard: Disparate Treatment</u>

Title VII states that employers cannot "discriminate against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment because of such individual's" race or sex. 42 U.S.C. § 2000e-2(a)(1). Disparate-treatment claims are the most "easily understood type of discrimination"—the employer "simply treats some people less favorably than others" because of a protected status. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). "A disparate-treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related action." *Ricci v.*

---

[5] Tyler-Perkins cannot bring a discrimination claim for her allegations that JSRCC did not hire her for positions for which she was qualified, hired less qualified Caucasian males over her, made her share her tool box key with other employees, and failed to award her a twelve-month teaching contract because these allegations are time-barred. *Morgan*, 536 U.S. at 113. The Court may consider these allegations, however, as "background evidence in support of [her] timely filed claim" relating to her October 2017 layoff. *Id.*

Even if the Court were to consider these allegations as background, it would still find that Tyler-Perkins fails to state a claim for race and gender discrimination.

*DeStefano*, 557 U.S. 557, 577 (2009) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 877, 986 (1988)).

When no direct evidence of discriminatory intent exists,[6] the plaintiff must proceed under the *McDonnell Douglas* "burden-shifting" framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this standard, the plaintiff carries the initial burden of establishing a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. 792. To establish a prima facie case of race or gender discrimination under Title VII a plaintiff must establish: (1) that he or she is a member of a protected class, (2) that his or her job performance was satisfactory, (3) that he or she was subject to an adverse employment action by his or her employer and (4) that similarly situated employees outside of his or her protected class received more favorable treatment." *See McDonnell Douglas*, 411 U.S. at 802; *see Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) (applying similar factors to a Title VII gender discrimination claim). After the plaintiff establishes this prima facie case of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802.

At the Motion to Dismiss stage, "a Title VII plaintiff need not plead facts that constitute a prima facie case, [but] a plaintiff still bears the burden of alleging facts sufficient to state all the elements of her claim." *Turner v. Richmond Pub. Schools*, No. 3:16cv256, 2017 WL 1179162, at *12 (E.D. Va. Mar. 28, 2017) (internal quotation marks and citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017) (stating that a plaintiff seeking to raise an employment discrimination claim "need not plead facts sufficient to establish a prima facie

---

[6] Tyler-Perkins does not argue that she submitted direct evidence of discrimination suggesting agreement that she must proceed under *McDonnell-Douglas's* burden shifting framework.

16

case of race-based discrimination to survive a motion to dismiss, but . . . the more stringent pleading standard established in *Iqbal* and *Twombly* applies.").

> **2.** **Because Tyler-Perkins Does Not Allege Facts to Support the Existence of An Adverse Employment Action on Behalf of JSRCC, She Does Not Satisfy the Third Element a Gender or Race Discrimination Claim**

At the Motion to Dismiss stage, Tyler-Perkins must "alleg[e] facts sufficient to state all the elements of her claim." *Turner*, 2017 WL 1179162, at \*12. The Parties agree that Tyler-Perkins alleges facts to support the first two elements—that she constitutes a member of a protected class and that she satisfactorily performed her job. (Am. Compl. ¶¶ 12, 14.) As an African American woman, Tyler-Perkins belongs to two protected classes. (*Id.* ¶ 12.) She has also alleged sufficient facts to show that she satisfactorily performed her job. For instance, Tyler-Perkins states that she "was an excellent employee and satisfactorily performed her job duties." (*Id.* ¶ 14.) In support of this contention, Tyler-Perkins states that JSRCC promoted her from an "Adjunct Instructor" to "full-time Nine-Month Teaching Faculty." (*Id.* ¶¶ 13, 15.) JSRCC also gave her the job of "Coordinator of the Ford ASSET Program" after the previous Coordinator fell ill. (*Id.* ¶ 20.) However, Tyler-Perkins falters at element three—even reading her allegations favorably—because she does not allege facts to support her claim that JSRCC subjected her to an adverse employment action. The Court must so find for two reasons: (1) because JSRCC fully reinstated her following her successful appeal and (2) because JSRCC did not constructively discharge her.

> **a.** **Tyler-Perkins's Layoff Cannot Constitute an Adverse Employment Action Under These Particular Circumstances**

The third element of a Title VII race or gender discrimination claim requires the plaintiff to show that "[he or] she was subject to an adverse employment action by [his or] her employer." *McDonnell Douglas*, 411 U.S. at 802. "An adverse employment action is a discriminatory act

17

which adversely affects the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (internal quotations marks and citations omitted).

Tyler-Perkin layoff cannot constitute an adverse employment action because as she acknowledges in her Amended Complaint, JSRCC ultimately reinstated her with "no loss of rank, seniority, status, or continuity of service." (Am. Compl. ¶¶ 43–44.) Because Tyler-Perkins pairs her allegations that the new job that she took paid her a lower salary and required a longer commute from her home, (*id.* ¶ 42), with her allegation that JSRCC reinstated her "without any loss of rank, seniority, status, or continuity of service," Tyler-Perkins does not articulate how she suffered any monetary loss from her temporary layoff.[7] Therefore, because Tyler-Perkins did not lose any of the benefits that she had at JSRCC due to her reinstatement, her layoff did not adversely affect the "terms, conditions, or benefits" of her employment under these particular circumstances. *See Booz-Allen & Hamilton, Inc.*, 368 F.3d at 375.

**b.    JSRCC Did Not Constructively Discharge Tyler-Perkins**

Tyler-Perkins attempts to save her Title VII claim by asserting that JSRCC constructively discharged her. In the Amended Complaint, she states that she "involuntarily resigned from

---

[7] Defendants attach to their Motion to Dismiss a letter that was sent to Tyler-Perkins after her reinstatement with JSRCC. This letter shows that Tyler-Perkins received severance payments as well as continued health insurance for one year following her layoff, and that JSRCC further reimbursed Tyler-Perkins for the remainder of the Spring 2018 semester. (Mem. Supp. Mot. Dismiss Ex. 13.)

Although Tyler-Perkins does not challenge the authenticity of this letter, the Court cannot consider it without construing the Motion to Dismiss as a Motion for Summary Judgment because the letter is not "integral to the [Amended] [C]omplaint." *See Trigon Healthcare, Inc.*, 367 F.3d at 234 ("When a defendant attaches a document to its motion to dismiss, a 'court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'") As such, the Court disregards the letter.

JSRCC" due to JSRCC's "prior discriminatory practices, fear of returning to a hostile work environment, just having obtained her new job position, and feeling she had no other option." (Am. Compl. ¶ 46.) However, these facts, even when read favorably, do not support her assertion that her final resignation amounted to constructive discharge.

"The Supreme Court . . . has clearly articulated the standard for constructive discharge, requiring objective 'intolerability'—'circumstances of discrimination [that] are so intolerable that a reasonable person would resign—but not 'deliberateness,' or subjective intent to force a resignation.'" *EEOC v. Consol Energy Inc.*, 860 F.3d 131, 144 (4th Cir. 2017) (quoting *Green v. Brennan*, 136 S. Ct. 1769, 1779 (2016)). "Intolerability is not established by showing merely that a reasonable person, confronted with the same choices as the employee would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign." *Perkins*, 936 F.3d at 212 (internal quotation marks and citations omitted). "Instead, intolerability is assessed by the objective standard of whether a reasonable person in the employee's position would have felt *compelled* to resign . . . that is whether he [or she] would have had *no choice* but to resign." *Id.* (emphasis in original) (internal quotations marks and citations omitted). "[D]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign" and do not support constructive discharge claims. *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004). Notably, "[p]roof of constructive discharge requires a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Perkins*, 936 F.3d at 212 (internal quotation marks and citations omitted).

19

Two cases from the United States Court of Appeals for the Fourth Circuit provide examples of the type of conduct that may support a constructive discharge claim. First, in *Williams*, the Fourth Circuit concluded that a plaintiff's allegations that "her supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back . . . [did] not establish the objectively intolerable working conditions necessary to prove constructive discharge." *Williams*, 370 F.3d at 434 (citations omitted). In those circumstances, the Fourth Circuit affirmed the district court's finding that the plaintiff's employer did not constructively discharge her. *Id.*

Second, in contrast, in *Consol Energy* the Fourth Circuit considered a situation in which an employee objected to the use of a hand scanner on religious grounds. 860 F.3d at 137. The employee offered a cost-free accommodation to resolve his religious objection, but the employer refused. *Id.* at 138–39. The employer, however, accommodated non-use of the hand scanner for other employees who did not have a religious objection to the scanner. *Id.* at 139. The employee ultimately "retire[d] under protest." *Id.* Following a trial in the district court, a jury found for the EEOC who brought the action on behalf of the employee. *Id.* at 140. On appeal, the Fourth Circuit considered the district court's decision to deny the employer's renewed motion for judgment as a matter of law, which the employer brought alleging that insufficient evidence existed to uphold the jury's verdict. *Id.* at 140–41. On this basis, the Fourth Circuit concluded that because the employee "was put in an intolerable position when [the employer] refused to accommodate his religious objection," his employer constructively discharged him. *Id.* at 144–45.

In the Amended Complaint, Tyler-Perkins states that due to JSRCC's "prior discriminatory practices, fear of returning to a hostile work environment, just having obtained

her new job position, and feeling she had no other option, [she] involuntarily resigned from JSRCC" in 2018. (Am. Compl. ¶ 46.) Tyler-Perkins also alleges that JSRCC violated the Policy when it laid her off in October 2017, but retained a more recently hired employee. (*Id.* ¶ 39.) Although Tyler-Perkins ultimately won the appeal she took following her layoff and clearly experienced a disagreeable working environment prior to her layoff, the Court is constrained to conclude that the allegations presented in her Amended Complaint do not rise, under the law, to a level of intolerability such that "a reasonable person in [Tyler-Perkins's] position . . . would have had *no choice* but to resign." *Perkins*, 936 F.3d at 212 (internal quotation marks and citations omitted). Here, JSRCC ultimately reinstated Tyler-Perkins "without any loss of rank, seniority, status, or continuity of service." (Am. Compl. ¶ 43.) Such reinstatement following a successful appeal strongly counsels against a finding that a reasonable person would feel compelled to resign—even when considering the email she received regarding upcoming layoffs.

Tyler-Perkins further attempts to support her constructive discharge claim by stating that "a JSRCC representative informed [her], by counsel, she was again going to be slated for JSRCC's next and upcoming round of layoffs and it would be in her best interest to resign." (*Id.* ¶ 45.) As discussed above, Defendants attach the email to which Tyler-Perkins refers to their Motion to Dismiss. (The Email 1.) In her response to the Motion to Dismiss, Tyler-Perkins does not contest the validity of this email or attempt to provide further context to it. The email shows that, prior to Tyler-Perkins's reinstatement, JSRCC sent the email to all staff and faculty informing them of the upcoming budget cuts and the need to implement budget saving measures. (*Id.* 2–3.) As shown in the attachment, Counsel for JSRCC then forwarded this email from the President of the school to Tyler-Perkins's counsel because it felt "strongly that Ms. Tyler-Perkins should have the information . . . so that she may make an informed decision on the college's

recent offer of reinstatement." (*Id.* 1.) The email also clarifies that "this information does not negatively affect the offer of reinstatement in any way." (*Id.*)

Even viewing the record in Tyler-Perkins's favor, the email that Tyler-Perkins's counsel received demonstrates that JSRCC did not single out Tyler-Perkins to inform her that she would be laid off again. Instead it informed all faculty and staff of such a possibility. Budget cuts requiring layoffs unfortunately occur. Given the stringent pleading standards this Court must apply, the Court cannot conclude that the allegations show that JSRCC objectively *compelled* Tyler-Perkins to resign, even if she had *some* reasonable basis to do so.

The Court's conclusion that Tyler-Perkins does not sufficiently allege a hostile work environment claim further supports its conclusion that Tyler-Perkins has not met the objective intolerability standard required to establish a constructive discharge claim. *See Perkins*, 936 F.3d at 212 ("Proof of constructive discharge requires a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." (internal quotation marks and citations omitted)). Having failed to plausibly plead a hostile work environment claim, Tyler-Perkins's allegations similarly do not meet the stringent intolerability standard required to sustain a constructive discharge claim because she decided to resign after receiving an email previously sent to all faculty and staff regarding university-wide layoffs due to budget cuts. *See Nnadozie*, 730 F. App'x at 162.

Because Tyler-Perkins's layoff cannot constitute an adverse employment action under the circumstances at bar and JSRCC did not constructively discharge her, Tyler-Perkins fails to allege sufficient facts to support the third element of a race or gender discrimination claim—that JSRCC subjected her to an adverse employment action. *See McDonnell Douglas*, 411 U.S. at 802. "Although a Title VII plaintiff need not plead facts that constitute a prima facie case, a

22

plaintiff still bears the burden of alleging facts 'sufficient to state all the elements of her claim."[8]

*Turner*, 2017 WL 1170162, at *12; *see also Woods*, 855 F.3d at 648.  Tyler-Perkins has not done so here.

## IV. Conclusion

For the foregoing reasons, the Court will grant the Defendants' Motion to Dismiss. Although the Court does not see how Tyler-Perkins could amend her Complaint to plausibly state a Title VII claim for race or gender discrimination, in lieu of making a futility finding, the Court will order Tyler-Perkins to show cause why the Court should grant her leave to file a Second Amended Complaint should she seek to do so.  Tyler-Perkins must do so no later than January 31, 2020.  She must file the proposed Second Amended Complaint with the show cause

---

[8] The Court recognizes that the fourth prong of the *McDonnell Douglas* test—that "similarly situated employees outside of his or her protected class received more favorable treatment"—may be a close call on the facts Tyler-Perkins alleges.  *See McDonnell Douglas*, 411 U.S. at 802.  To meet this element, Tyler-Perkins must show that she is "similar in all relevant respects to [her] comparator," including that they "dealt with the same supervisor, were subject to the same standard and engaged in the same conduct."  *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010).

Here, Tyler-Perkins relies on her Caucasian male coworkers as her comparators.  For instance, she relies on the the more-recently hired program head of Automotive Technology to show that her layoff violated Title VII.  Although this individual held a different job title, he might have constituted a comparator against whom the Court could judge Tyler-Perkins's allegations as to her layoff.  Because JSRCC retained this individual when it laid off Tyler-Perkins, allegedly in violation of the Policy, the fourth prong of a race or gender discrimination claim might be implicated.

However, because Tyler-Perkins fails to plead sufficient facts to satisfy the third element of a discrimination claim, and a Title VII plaintiff must allege facts sufficient to state *all* the elements of her claim, the Court declines to rule on whether Tyler-Perkins met the standard as to prong four.

document seeking leave to file. If the Tyler-Perkins does not file a response by January 31, 2020, the Court will enter final judgment in this case.

An appropriate order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Date: 1/10/2020
Richmond, Virginia